1
 2025 CO 45 The People of the State of Colorado, Petitioner: v. Michelle Re Nae Bialas. Respondent: No. 23SC520
Supreme Court of Colorado, En Banc
June 23, 2025

 Certiorari to the Colorado Court of Appeals Court of Appeals
Case No. 21CA1645.

 Attorneys for Petitioner: Philip J. Weiser, Attorney General
Jaycey DeHoyos, Assistant Attorney General Denver, Colorado.

 Attorneys for Respondent: Megan A. Ring, Public Defender
Meredith K. Rose, Deputy Public Defender Denver, Colorado.

 JUSTICE BERKENKOTTER delivered the Opinion of the Court, in
 which CHIEF JUSTICE MARQUEZ, JUSTICE HOOD, and JUSTICE
 GABRIEL joined.

 JUSTICE HART, joined by JUSTICE BOATRIGHT, and JUSTICE SAMOUR
 dissented.

 OPINION

 BERKENKOTTER, JUSTICE.

 ¶1
We granted certiorari to review the decision of a division of
 the court of appeals, concluding that the trial court
 violated Michelle Re Nae Bialas's Sixth Amendment right
 to a public trial. People v. Bialas, 2023 COA 50,
 ¶ 6, 535 P.3d 999, 1002. The trial court erred, the
 division decided, when it removed all members of the public,
 including members of Bialas's family, from the physical
 courtroom during her jury trial, even though the proceedings
 remained accessible to the public virtually on Webex and via
 video and audio streaming in an auxiliary courtroom.
Id. The division reversed Bialas's conviction
 and remanded her case for a new trial after it determined
 that a nontrivial partial courtroom closure occurred and that
 the closure was not justified under the factors articulated
 by the Supreme Court in Waller v. Georgia, 467 U.S.
 39, 48 (1984). Bialas, ¶¶ 20, 27-28, 535
 P.3d at 1004-05.

 ¶2
We now conclude, for the reasons we explain in Rios v.
 People, 2025 CO 46, __ P.3d __, which we announce today,
 that the availability of free, contemporaneous virtual access
 alone does not satisfy a defendant's Sixth
 Amendment right to a public trial. We additionally conclude
 that the trial court's decision to remove all spectators
 from the courtroom and to fully close the courtroom based on
 misconduct by some of the spectators was a nontrivial closure
 that violated Bialas's Sixth Amendment right. And because
 the closure here was

 not justified under the factors set forth in Waller,
 we affirm the judgment of the court of appeals.

 I.
Facts and Procedural History

 ¶3
 In 2017, a jury convicted Bialas of multiple charges related
 to an assault on her ex-boyfriend, James Bynum. After a
 division of the court of appeals reversed the conviction,
 People v. Bialas, No. 17CA1841 (Dec. 17, 2020), the
 prosecution retried Bialas. The second trial commenced in
 July 2021 during the COVID-19 pandemic. During a pretrial
 conference, the court explained that because of social
 distancing requirements, the jurors would be dispersed
 throughout the courtroom, reducing the space available for
 potential spectators to one row at the back of the gallery.
The court added that anyone who could not find a seat in the
 courtroom could watch the trial virtually on Webex or via
 video and audio streaming in an auxiliary
 courtroom.[1] Certain members of Bialas's and
 Bynum's families attended the trial in person in the
 physical courtroom.

 ¶4
 On the third day of trial, during defense counsel's
 direct examination of Bialas, the court held a bench
 conference. Because the court was unable to mute the
 microphones it normally used for such conferences, it held
 the bench conference with the attorneys outside of the
 courtroom. When the judge, attorneys, and court reporter
 returned, a juror passed the court a note that stated,
 "[T]he spectators behind me were discussing the history
 of this case and we could hear them." The court asked
 everyone other than the trial participants to leave the
 courtroom and explained to the members of the public that
 they could watch the rest of the trial virtually in the
 auxiliary courtroom.

 ¶5
 After clearing the room, the court brought the jurors who
 were within earshot of the spectators back to the courtroom
 and questioned them regarding what they had heard. Two of the
 jurors indicated that they heard the alleged victim's
 family comment about a previous trial. One juror said they
 heard someone say that there had been a previous trial and
 the word "guilty." That juror added that
 "there was some indication as to the bias of this trial
 being[,] you know[,] being in favor of the defendant."
Another juror indicated that the juror could hear the
 spectators "snicker [at] whatever the defense attorney
 would say."

 ¶6
 After the jurors were questioned, neither party requested a
 mistrial, although defense counsel asked that Bialas's
 family be allowed to return to the courtroom since the jurors
 had indicated that it was members of Bynum's family, not
 Bialas's, who had made the comments. The district court
 denied defense counsel's request to allow Bialas's
 family to remain, stating:

All spectators will be banned from the courtroom for the rest
 of the day and they can be across the hall and watch the
 proceedings via Web[e]x just like anybody else, but I'm
 not going to now inquire from each one of the spectators who
 is at fault. It is my province to govern what [is] happening
 here in the courtroom and something has happened which is not
 proper . . . and I'm not going to sit around and try and
 determine who is at fault for making comments or not. The
 best, easiest, and uniform [rule] is that there will be no
 further spectators for the rest of the trial in the
 courtroom.

 ¶7
 Defense counsel objected, claiming that the exclusion of the
 public violated Bialas's right to a public trial. The
 court overruled the objection, and the trial proceeded.
Bialas's family and Bynum's family watched the
 remainder of the trial virtually from the auxiliary
 courtroom. The jury subsequently convicted Bialas of second
 degree assault and violation of a protection order.

 ¶8
 A division of the court of appeals reversed Bialas's
 conviction and remanded the case for a new trial.
Bialas, ¶ 28, 535 P.3d at 1005. First, the
 division concluded that the removal of members of the two
 families from the courtroom constituted a partial closure
 despite the availability of a live video and audio stream of
 the proceeding. Id. at ¶ 15, 535 P.3d at 1003.
It further held that the

 closure was nontrivial because the closure lasted for part of
 Bialas's testimony and the entirety of both closing
 arguments, which undercut the assurance of a fair trial.
Id. at ¶¶ 18, 20, 535 P.3d at 1003-04.
Additionally, the division reasoned that the closure was
 intentional, and it caused Bialas's family to move to the
 auxiliary courtroom. Id. at ¶ 19, 535 P.3d at
 1004. Relying on People v. Jones, 2020 CO 45, 464
 P.3d 735, the division noted the importance placed upon
 "the presence of a defendant's family . . . in
 ensuring a fair trial." Id. at ¶ 12, 535
 P.3d at 1003 (omission in original) (quoting Jones,
 ¶ 41, 464 P.3d at 744). Thus, it found that by removing
 Bialas's family during her testimony, they no longer
 served as a reminder to the judge, prosecutor, and jury
 regarding their responsibility to treat Bialas fairly,
 undercutting the assurance of a public trial. Id. at
 ¶¶ 18-19, 535 P.3d at 1003-04.

 ¶9
 Last, the division applied the Waller factors and
 concluded that the closure was not justified and thus
 violated Bialas's right to a public trial. Id.
 at ¶¶ 21-27, 535 P.3d at 1004-05. Specifically, the
 division determined that (1) because Bialas's family had
 not made the improper comments, there was no overriding
 interest in removing them; (2) the closure was broader than
 necessary because it was based on the misbehavior of a few
 spectators; (3) allowing Bialas's family to remain was a
 reasonable alternative to complete removal of the public; and
 (4) the court did not make sufficient findings in support of
 the closure. Id. at ¶¶ 22-25, 535 P.3d at
 1004-05.

Thus, the division held that the partial closure was
 unconstitutional and, as such, was structural error.
Id. at ¶ 27, 535 P.3d at 1005. Accordingly, it
 reversed the judgment of conviction and remanded the case for
 a new trial. Id. at ¶ 28, 535 P.3d at 1005.

 ¶10
The People petitioned this court for a writ of certiorari,
 which we granted.[2]

 II.
Analysis

 ¶11
We begin by setting out the appropriate standard of review.
We then describe the applicable law regarding a
 defendant's constitutional right to a public trial. Next,
 we address whether a courtroom closure occurred when the
 trial court excluded Bialas's family and Bynum's
 family and closed the physical courtroom to all other
 spectators but provided virtual access to the trial. After
 concluding that a courtroom closure occurred, we apply the
 triviality standard set forth in People v. Lujan,
 2020 CO 26, 461 P.3d 494, to determine whether the closure
 violated Bialas's right to a public trial. We go on to
 conclude that the courtroom

 closure was nontrivial and not justified under
 Waller. Finally, because the closure violated
 Bialas's right to a public trial, we affirm the judgment
 of the court of appeals.

 A.
Standard of Review

 ¶12
 Our review of a trial court's decision to close the
 courtroom involves a mixed question of fact and law.
Rios, ¶ 17. We defer to the trial court's
 factual findings absent an abuse of discretion, but we review
 its legal conclusions de novo. Id.

 B.
Sixth Amendment Right to a Public Trial

 ¶13
 Both the U.S. and Colorado Constitutions guarantee criminal
 defendants the right to a public trial. U.S. Const. amends.
 VI, XIV; Colo. Const. art. II, § 16. In Rios,
 we explained the importance of the right to a public trial
 and the purposes it serves. ¶¶ 19-20. One such
 purpose is to ensure the presence of interested spectators
 "for the benefit of the accused." Waller,
 467 U.S. at 46 (quoting Gannett Co. v. DePasquale,
 443 U.S. 368, 380 (1979)). The presence of such spectators
 serves, among other things, to keep an accused's
 "triers keenly alive to a sense of their responsibility
 and to the importance of their functions." Id.
(quoting Gannett Co., 443 U.S. at 380). This, in
 turn, provides a safeguard against any attempt to employ our
 courts as instruments of persecution. In re Oliver,
 333 U.S. 257, 270 (1948).

 ¶14
 However, the Supreme Court has emphasized that the purpose of
 the right to a public trial extends beyond the accused.
"[I]n the broadest terms, public access to criminal
 trials permits the public to participate in and serve as a
 check upon the judicial process-an essential component in our
 structure of self-government." Globe Newspaper Co.
 v. Superior Ct., 457 U.S. 596, 606 (1982). For example,
 the right to a public trial maintains public faith and
 confidence in the justice system by allowing the public to
 see that the accused is fairly dealt with, ensuring that
 judges and prosecutors discharge their duties responsibly,
 encouraging witnesses to come forward, and discouraging
 perjury. Waller, 467 U.S. at 46. The right also
 "vindicate[s] the concerns of the victims and the
 community in knowing that offenders are being brought to
 account for their criminal conduct by jurors fairly and
 openly selected." Press-Enter. Co. v. Super.
 Ct., 464 U.S. 501, 509 (1984).

 ¶15
 With these purposes in mind, we turn to the facts of this
 case.

 C.
Whether a Closure Occurred

 ¶16
The People argue that the removal of Bialas's family from
 the physical courtroom did not constitute a closure because
 the public had free and contemporaneous access to observe the
 proceedings virtually. For the reasons we explain in our
 opinion in Rios, announced today, we disagree.

 ¶17
 In Rios, we considered whether virtual access to
 observe courtroom proceedings alone could satisfy a
 defendant's Sixth Amendment right to a public trial.
¶ 25. To answer the question, we examined the purposes
 the right serves, including spectators' role in keeping
 the jury "keenly alive" to the importance of its
 function and to a sense of its responsibility. Id.
at ¶ 27. We looked as well to its role in ensuring that
 judges and prosecutors carry out their duties responsibly,
 encouraging witnesses to come forward, and discouraging
 perjury. Id.

 ¶18
 Ultimately, we concluded that "the Sixth Amendment right
 to a public trial is best understood as a trial that
 is open to the public, meaning that the public has a
 reasonable opportunity to be physically present to
 observe the proceedings." Id. at ¶ 28.
That is to say, virtual access alone does not meet a
 defendant's public trial right. Id. at ¶
 36. We reach this conclusion for three reasons. First, this
 understanding hews most closely to the purposes of the right
 to a public trial. This connection is particularly striking
 as it pertains to the public's role in keeping the jury
 "keenly alive to a sense of their responsibility"
 and to the importance of their function by virtue of the
 public's presence. Waller, 467 U.S. at
 46 (quoting Gannett Co., 443 U.S. at 380). As we
 noted in Rios, screens in a courtroom, no matter
 their number or the nature of their display, are an
 inadequate substitute for the physical presence of real
 spectators in the gallery and the powerful reminder that
 those spectators provide to jurors regarding the gravity of
 their role. ¶ 29. Plus, this

 virtual technology is typically not configured to allow
 jurors to see spectators due to the risk of disruption and
 potential mistrial.

 ¶19
 Second, this reading comports with the ordinary understanding
 of the term "public," which is defined as
 "exposed to general view: open." Public,
 Merriam-Webster Dictionary,
 https://www.merriam-webster.com/dictionary/ public
 [https://perma.cc/9KAV-94U6]. The term "presence"
 is defined as "the fact or condition of being
 present." Presence, Merriam-Webster Dictionary,
 https://www.merriam-webster.com/dictionary/presence
 [https://perma.cc/ 3KKL-LJ59]. The term "present"
 is defined as "constituting the one actually involved,
 at hand, or being considered." Present,
 Merriam-Webster Dictionary,
 https://www.merriam-webster.com/dictionary/present
 [https://perma.cc/7VRZ-JQ9H]. As we explained in
 Rios, when read in tandem, these definitions support
 the understanding that a public trial involves the
 opportunity for spectators to be physically present
 to observe the proceedings. ¶ 30.

 ¶20
 Third, and finally, the Framers saw great value in the
 benefits associated with a public trial. Waller, 467
 U.S. at 49 n.9. The Framers, of course, could not have
 imagined a public trial that involved spectators who were not
 somehow physically present. See Richmond Newspapers, Inc.
 v. Virginia, 448 U.S. 555, 577 (1980); see also
United States v. Haymond, 588 U.S. 634, 642 (2019)
("[T]he constitution's guarantees cannot mean less
 today than they did the day they were

 adopted."). And the Framers could not have imagined the
 bandwidth and connectivity issues that district courts around
 the state face from time to time. More importantly, changes
 in technology do not lessen constitutional protections. Thus,
 we reject the People's argument that the Sixth Amendment
 does not require the public to have access to a physical
 courtroom so long as it has the free and contemporaneous
 opportunity to virtually observe proceedings.[3]

 ¶21
 Because virtual access alone is not sufficient to meet a
 defendant's public trial right, we conclude that a
 closure occurred when the court excluded the Bialases and all
 other members of the public from the physical courtroom for
 the remainder of her trial.

 ¶22
We emphasize that it was not the court's initial order,
 which significantly limited the seating capacity in the
 courtroom due to the COVID-19 pandemic that forms the basis
 for our conclusion in this regard. The court's order left
 seats for spectators in the back of the gallery. This limit
 was based on the public health

 restrictions that required the jurors to spread out across
 the gallery and necessarily confined the public seating
 available in the courtroom. As we explained in Rios,
 that is not a closure. ¶ 33. During the
 COVID-19 pandemic, courtroom capacity was often limited by
 public health orders concerning permissible uses of indoor
 spaces. The inability of some members of the public
 to be physically present because of space limitations is not
 a closure. These limitations may exist due to health-related
 restrictions, as with the COVID-19 pandemic, or simply
 because-as with some high profile cases-there are more
 interested members of the public than there are available
 seats.

 ¶23
 And, as we additionally observed in Rios, when a
 court offers hybrid proceedings-i.e., the courtroom remains
 open but there is only limited seating capacity, and the
 court offers access over a virtual platform-that is not a
 closure either, as long as the courtroom remains open.
Id. at ¶ 36. In that instance, the virtual
 access options are merely additional means of viewing the
 proceeding that are not constitutionally required.

 ¶24
 However, if a court totally excludes the public from the
 physical courtroom, that is a closure subject to a
 Waller analysis. Relatedly, if a court ejects a
 particular person or group of persons from the courtroom,
 that is also a closure subject to a Waller analysis.
People v. Turner, 2022 CO 50, ¶ 18, 519 P.3d
 353, 359.

 ¶25
 Both types of closures were implicated here. The trial court
 ejected Bialas's and Bynum's families from the
 courtroom. It also closed the courtroom to all other
 spectators. Thus, there was a closure.

 ¶26
 Our analysis, however, does not stop there. To implicate a
 defendant's right to a public trial, the courtroom
 closure must be nontrivial. Lujan, ¶ 23, 461
 P.3d at 499.

 D.
Whether the Closure Was Trivial

 ¶27
 The closure of a physical courtroom can violate a
 defendant's constitutional right to a public trial.
Jones, ¶ 27, 464 P.3d at 741. But "the
 Sixth Amendment is not necessarily violated 'every time
 the public is excluded from the courtroom.'"
Lujan, ¶ 16, 461 P.3d at 498 (quoting
Peterson v. Williams, 85 F.3d 39, 40 (2d Cir.
1996)). "[S]ome closures are simply so trivial that they
 do not rise to the level of a constitutional violation."
Id. To determine whether a closure is trivial, we
 consider (1) the duration of the closure, (2) the substance
 of the proceedings that occurred during the closure, (3)
 whether the proceedings were later memorialized in open court
 or placed on the record, (4) whether the closure was
 intentional, and (5) whether the closure was total or
 partial. Id. at ¶ 19, 461 P.3d at 498-99. This
 list of factors is nonexhaustive, and no single factor is
 dispositive. Id., 461 P.3d at 499. Further, under
 this standard, "we look to the closure at issue and
 consider

 whether it implicated the protections and values of the
 public trial right." Id. at ¶ 28, 461 P.3d
 at 500.

 ¶28
 Applying this standard, we conclude that the closure here was
 nontrivial under the totality of the circumstances. In
 Lujan, this court concluded that the trial
 court's decision to close the courtroom to reread a
 limiting instruction to the jury "that it had previously
 read in open court" was trivial because it lasted
 "only a matter of minutes." ¶ 29, 461 P.3d at
 500. However, here, the closure lasted for the rest of
 Bialas's testimony and all of the closing arguments.

 ¶29
 Moreover, the closure was intentional. "[I]ntentional
 closures during more significant, and less fleeting,
 testimony are generally considered not trivial because of
 their potential to affect the fairness of the
 proceedings." Jones, ¶ 40, 464 P.3d at
 744. For example, in People v. Hassen, 2015 CO 49,
 ¶ 16, 351 P.3d 418, 422, we concluded that a closure
 during two witnesses' testimony, which spanned
 twenty-seven pages of the transcript, was not trivial. Here,
 Bialas's testimony spanned twenty-seven pages, and the
 closing arguments spanned another thirty-four. Additionally,
 in Jones, we concluded that a closure lasting almost
 an entire afternoon during the ten-day trial was not brief,
 and therefore, nontrivial. ¶ 42, 464 P.3d at 744. The
 closure in this case included more than half a day in a
 four-day trial, further indicating that the closure was
 nontrivial.

 ¶30
 On these facts, we conclude that the total exclusion of the
 public and the expulsion of Bialas's family from the
 courtroom for more than half a day were both nontrivial
 closures.

 E.
Whether the Closure Was Constitutional

 ¶31
We next apply the four Waller factors to determine
 whether this nontrivial closure violated Bialas's
 constitutional right to a public trial.

 ¶32
 In Waller, the Supreme Court set forth a four-part
 test for trial courts to determine whether a courtroom
 closure complies with the Sixth Amendment. 467 U.S. at 48.
The test requires that (1) "the party seeking to close
 the [proceeding] must advance an overriding interest that is
 likely to be prejudiced," (2) "the closure must be
 no broader than necessary to protect that interest," (3)
"the trial court must consider reasonable alternatives
 to closing the proceeding," and (4) "it must make
 findings adequate to support the closure." Id.

 ¶33
We now turn to consider these factors, beginning with whether
 there was an overriding interest in closing the
 trial.[4] Id. Although trial judges have
 discretion to control their courtrooms by removing
 distracting spectators,

see Illinois v. Allen, 397 U.S. 337, 343 (1970), and
 the court's concern here regarding the improper conduct
 was well-founded, there is no evidence in the record that the
 threat of disruption in this case came from Bialas's
 family. Rather, all signs indicated that the problematic
 comments were made by the victim's family. Moreover,
 neither party sought to remove Bialas's family after the
 jurors indicated that they had not made the inappropriate
 comments. Thus, while the trial court's concern was
 understandable given the potential for a mistrial, there was
 no reason to exclude Bialas's family or to close the
 entire courtroom. The first Waller factor,
 accordingly, was not met.

 ¶34
 Next, we consider the second and third Waller
 factors: whether the closure was no broader than necessary
 and whether the court considered any reasonable alternatives
 to closing the proceeding. 467 U.S. at 48. Here, the trial
 court could have made findings and properly removed the
 victim's family to prevent further disruption of the
 trial, to protect the jury from ex parte communications, and
 to prevent a (second) mistrial, but it did not do so.
Instead, it imposed a "uniform rule," declining to
 "take sides as to who it is or what spectators get
 special preference over other spectators." But in
 applying a blanket rule, the court not only excluded the
 Bynums from the courtroom, it also excluded Bialas's
 family members and all other potential spectators from the
 opportunity to observe the proceedings in person. Perhaps the
 court viewed the available virtual public

 access as a reasonable alternative, but if so, it did not
 explain this on the record. And even so, as we have
 explained, virtual public access alone does not satisfy a
 defendant's right to a public trial. Because the court
 did not limit the scope of the closure or consider whether
 there were reasonable alternatives to entirely closing the
 courtroom, we conclude that the second and third
 Waller factors were not met.

 ¶35
 Last, we turn to the fourth Waller factor-whether
 the court made findings adequate to support the closure.
Id. We conclude that it did not. "[W]e gauge
 'compliance by substance, not form.'"
Rios, ¶ 52 (quoting Turner, ¶ 35,
 519 P.3d at 362). Here, the court did not follow
 Waller in substance or form. Its findings were
 limited to its comment that it was not going to decide who
 caused the disruption. Therefore, we conclude that the fourth
 Waller factor was not satisfied.

 ¶36
 Because the exclusion of Bialas's family and the entire
 public from the physical courtroom constituted a nontrivial
 closure that did not satisfy any of the Waller
 requirements, we conclude that the closure violated
 Bialas's right to a public trial.

 III.
Conclusion

 ¶37
 Here, the exclusion of the public constituted a nontrivial
 closure that was not justified under the factors set forth in
 Waller, 467 U.S. at 48. Because Bialas's Sixth
 Amendment right to a public trial was violated, we affirm the
 judgment of the court of appeals.

 JUSTICE HART, joined by JUSTICE BOATRIGHT, and JUSTICE SAMOUR
 dissented.

 JUSTICE HART, joined by JUSTICE BOATRIGHT, and JUSTICE
 SAMOUR, dissenting.

 ¶38
 For the reasons I set out in more detail in my concurring
 opinion in Rios v. People, 2025 CO 46, P.3d, I
 disagree with the majority's conclusion that "the
 availability of free, contemporaneous virtual access
 alone does not satisfy a defendant's Sixth
 Amendment right to a public trial." Maj. op. ¶ 2.

 ¶39
 In Rios, the majority concluded that application of
 the factors articulated by the U.S Supreme Court in
 Waller v Georgia, 467 U.S. 39, 48 (1984), to justify
 a courtroom closure warranted what it perceived as a closure
 of the proceedings Rios, ¶ 53 Thus, although I disagreed
 with the majority that the proceedings were in fact closed, I
 concurred in the judgment Rios, ¶ 68 (Hart, J,
 concurring).

 ¶40
 Here, however, the majority concludes that the
 "closure" of the proceedings was not justified
 because the physical courtroom was closed to the public
 without sufficient justification. Maj. op. ¶ 35.

 ¶41
 In my view, a trial has not been closed when (1) critical
 proceedings are open to contemporaneous public scrutiny
 (in-person or virtual), and (2) the participants in the
 process (jurors, lawyers, witnesses, and judges) are aware
 that those critical proceedings are subject to
 contemporaneous public scrutiny. When those criteria are met,
 a defendant's Sixth Amendment public trial right is
 protected. Because that was the case here, I respectfully
 dissent.

---------

[1] Webex is a video conferencing platform
 that allows a spectator to see and hear what is happening in
 a physical courtroom in real time virtually via a computer or
 phone. Depending on the placement of the camera or cameras
 providing the live feed, spectators may be able to see the
 entire courtroom or only a small part of it. In addition to
 allowing for virtual courtroom observation, Webex can also be
 configured with two-way video and audio to allow virtual
 courtroom participation. It is not ordinarily configured this
 way during jury trials given the very real risk of disruption
 and the potential for mistrials. This means that jurors
 cannot see when there are virtual spectators. Livestreaming
 is a term used to describe the real-time broadcasting of
 video and audio content over the internet. Livestreaming
 allows a spectator to remotely watch a court proceeding in
 real time. The video and audio are, however, not two-way.
That is, the people in the courtroom, including the jurors
 and the judge, cannot see that they are being
 watched.

[2] We granted certiorari to review the
 following issues:

1. Whether moving the defendant's family from the
 physical courtroom to a livestream viewing room constituted a
 closure under the Sixth Amendment when the defendant agreed
 that the viewing room was an appropriate accommodation for
 the public.

2. Whether the court of appeals erred in determining
 that a courtroom closure was nontrivial when the persons
 "excluded" maintained access to the proceedings
 through real-time video and audio livestreaming.

[3] As we observed in Rios,
 virtual courtroom technology like the platforms utilized here
 can be a great convenience to litigants, lawyers, the court,
 and the public. ¶ 26. This technology can also advance
 the important goal of increasing access to justice. We are
 mindful that this technology can also present challenges-from
 bandwidth issues that undermine reliable connectivity, to
 disruptions intentionally caused by individuals attempting to
 disturb digital court proceedings. The question before us,
 though, is not whether this technology is useful, but rather
 whether its use alone is sufficient to meet a defendant's
 public trial right.

[4] Many jurisdictions have considered
 whether the "overriding interest" standard is
 necessary in partial closure cases or whether a lesser
 standard-"substantial reason" -is more appropriate.
See Jones, ¶¶ 24-26, 464 P.3d at 741
(collecting cases and explaining the competing views on this
 issue). This is an issue we need not resolve today.

---------