1
 2025 CO 46 Isaiah Ismael Rios, Petitioner: v. The People of the State of Colorado. Respondent: No. 23SC571
Supreme Court of Colorado, En Banc
June 23, 2025

 Certiorari to the Colorado Court of Appeals Court of Appeals
Case No. 20CA2054

 Attorneys for Petitioner: Megan A. Ring, Public Defender
River B. Sedaka, Deputy Public Defender Denver, Colorado

 Attorneys for Respondent: Philip J. Weiser, Attorney General
Brittany Limes Zehner, Assistant Solicitor General Denver,
 Colorado

 CHIEF
 JUSTICE MARQUEZ, JUSTICE HOOD, and JUSTICE GABRIEL joined.

 JUSTICE HART, joined by JUSTICE BOATRIGHT, and JUSTICE SAMOUR
 concurred in the judgment.

 OPINION

 BERKENKOTTER, JUSTICE

 ¶1
This case requires us to decide a very modern question about
 a very old right: Can virtual public access to observe a
 criminal jury trial alone satisfy a defendant's Sixth
 Amendment right to a public trial?

 ¶2
Isaiah Ismael Rios's jury trial was held in the midst of
 the COVID-19 pandemic. The trial court issued an order in
 advance of trial, over Rios's objection, that excluded
 all spectators from the physical courtroom throughout the
 trial. Public access would instead, the court decided, be
 provided virtually. A division of the court of appeals
 concluded that this constituted a nontrivial partial
 courtroom closure. People v. Rios, No. 20CA2054,
 ¶ 25 (June 22, 2023). It further determined, however,
 that Rios's right to a public trial was not violated
 because the closure was warranted under the standard set
 forth by the Supreme Court in Waller v. Georgia, 467
 U.S. 39, 48 (1984). Rios, ¶ 32.

 ¶3
We now hold that virtual access alone is not a substitute for
 the public's reasonable opportunity to personally observe
 critical proceedings in a physical courtroom and that a
 courtroom closure occurred. However, after determining that
 the closure was nontrivial, we conclude that the closure did
 not violate Rios's right to a public trial because the
 court's decision-which was based on its concerns about
 the spread of the COVID-19 virus-was justified under the
 factors

 set forth in Waller. For these reasons, we affirm
 the judgment of the court of appeals.

 I.
Facts and Procedural History

 ¶4
 Rios was charged with sixteen counts ranging from criminal
 mischief to first degree murder in connection with a series
 of crimes that occurred over the course of eighteen days. His
 trial was originally scheduled for July 2020. However, on
 March 16, 2020, the Chief Justice issued an order ceasing the
 normal operation of Colorado state courts and suspending jury
 calls through April 2020 due to the rapid spread of COVID-19.
 Sup. Ct. of Colo., Off. of the Chief Just., Order
 Regarding COVID-19 and Operation of Colorado State
 Courts (Mar. 16, 2020), https://
 www.courts.state.co.us/userfiles/file/Media/Opinion_Docs/COVID-19%20Order%2016Mar2020(1).pdf
 [https://perma.cc/G599-PJPX]. The order was subsequently
 expanded and extended in June to preclude individuals from
 being summoned for jury service until August 2020. Sup. Ct.
 of Colo., Off. of the Chief Just., Updated Order
 Regarding COVID-19 and Operation of Colorado State
 Courts (June 15, 2020),
 https://www.courts.state.co.us/userfiles/file/Media/COVID/
 Chief%20Justice%20Operations%20Order%20June%2015.pdf
 [https://perma.cc/ B4GW-HH3K]. These orders were predicated
 on guidance from public health officials and were implemented
 for the protection of the public's health, safety, and
 welfare. People v. Hernandez, 2021 CO 45, ¶ 4,
 488 P.3d 1055, 1058.

 ¶5
 In June, Rios moved for a mistrial and to vacate his trial
 date under Crim. P. 24(c)(4), which allows courts to declare
 a mistrial on the grounds that a jury pool cannot safely
 assemble due to a public health crisis. The trial court
 granted the motion and reset the trial for October 7, 2020.
In late July, the Chief Justice amended his previous order to
 allow jury trials to resume after August 3, 2020, on a
 case-by-case basis, subject to the authorization of the chief
 judge in each judicial district, following their
 determination that a jury pool could not safely assemble,
 consistent with applicable executive orders and health
 directives. Sup. Ct. of Colo. Off. of the Chief Just.,
 Updated Order Regarding COVID-19 and Operation of
 Colorado State Courts (July 24, 2020),
 https://www.courts.state.co.us/userfiles/ file/Media/COVID/
 Chief%20Justice%20Operations%20Order%20July%2024.pdf
 [https://perma.cc/ TF87-UBZ9]. Following this reauthorization
 of jury trials, each judicial district prepared its own
 guidelines for safely managing court operations, including
 jury trials.

 ¶6
 In the Twentieth Judicial District, where Rios was charged,
 the Chief Judge provided this guidance by issuing
 Administrative Order 20-110 ("Order 20-110") and
 adopting a Plan for Resuming Jury Trials Safely During
COVID-19 Health Emergency (the "Resumption Plan").
Twentieth Jud. Dist. of Colo., Administrative Order
 20-110: Resumption of Jury Trials (July 30, 2020),
 https://www.courts.state.co.us/userfiles/file/Court_Probation/20th_Judicial_District/
 Admin%20Order%2020-110%20-%20Resumption%20of%20Jury%20Trials.pdf
 [https://perma.cc/SQS2-DBA5].

The Resumption Plan, which was developed with input from key
 stakeholders, incorporated guidance from the Centers for
 Disease Control and Prevention ("CDC"); the
 Colorado Department of Public Health and Environment; the
 Boulder County Public Health Department; and executive orders
 issued by Colorado Governor Jared Polis. Id. at 1-2.
It outlined the procedures required to safely hold jury
 trials based on that guidance. Id. at 4-12.

 ¶7
 Among other things, the Resumption Plan mandated that
 courthouses in the Twentieth Judicial District adhere to CDC
 guidelines pertaining to indoor business operations.
Id. at 2. These guidelines permitted operations in
 buildings "as long as the number of individuals inside
 of the business do[es] not exceed 50% of fire code occupancy
 capacity . . . [and] as long as individuals maintain at least
 six feet of distance between one another and are wearing
 facial coverings." Id. Additionally, the
 Resumption Plan provided that only one county court trial and
 one district court trial could occur each week, beginning on
 different days, to "control people traffic in the
 building." Id. at 6. Felony trials would be
 held in a specifically designated courtroom to "permit[]
 cleaning staff to thoroughly sanitize the courtroom as per
 CDC guidelines each day and minimize[] retrofitting

 efforts, such as relocating tables, microphones, etc."
Id. at 8. Jurors, under the Resumption Plan, were
 required to remain in the courtroom gallery during the trial
 to meet social distancing requirements. Id. at 9.
Further, the Resumption Plan required that public access to
 trial proceedings be made available via Webex, a virtual
 video conferencing platform. Id.

 ¶8
 After his trial date was reset to October 7, Rios moved for a
 continuance. He argued that he could not receive a fair trial
 because courts could not safely convene due to the pandemic.
The trial court was not persuaded. It denied the motion to
 continue, holding that Rios's arguments regarding safety
 were speculative and that judges in the Twentieth Judicial
 District had successfully resumed smaller, six-person jury
 trials in misdemeanor and dependency and neglect cases with
 "high public confidence and mixed verdicts" and
 without COVID-19 outbreaks. The court also noted that many
 other districts statewide had successfully resumed jury
 trials, including felony trials.

 ¶9
 Rios then filed a motion objecting to the court providing
 virtual-only access to the trial, arguing that barring the
 public from the courtroom, even if the proceedings could be
 viewed virtually, violated his Sixth Amendment right to a
 public trial. The court denied the motion, stating that
 "[t]he constitutional grounds for the motion are denied
 based upon procedures required by the health emergency."
Rios also filed a motion to conduct his trial outdoors, which
 the court

 denied as well, stating that the motion "lack[ed] any
 legal basis" and noting the "impossibility" of
 doing so.

 ¶10
 In October 2020, Rios's trial was the first felony trial
 held in the Twentieth Judicial District after the
 reinstatement of jury trials. When the trial began, the court
 explained that all public access to the physical courtroom
 would be restricted because of the COVID-19 health emergency
 but that public access would be available over Webex and via
 live video and audio streaming in an auxiliary courtroom.
Rios renewed his objection regarding public access to the
 trial. The court overruled the objection based on its prior
 rulings.

 ¶11
 Trial proceeded as scheduled. Consistent with Order 20-110
 and the Resumption Plan, the court required jurors to sit no
 less than six feet apart, spread across the entire gallery.
All trial participants were required to wear masks. Members
 of the public who wished to view the proceedings could do so
 virtually, consistent with the court's previous order.
And before each witness testified, the court confirmed that
 the witnesses had not seen any of the proceedings on the
 computer to comply with its sequestration order. The jury
 convicted Rios of first degree murder and various counts of
 assault, burglary, menacing, theft, and trespass.

 ¶12
 On appeal, Rios claimed that the court's refusal to
 provide the public with physical seats in the courtroom
 violated his right to a public trial. Making the trial

 proceedings available to the public virtually, he argued, did
 not ameliorate the violation of his public trial right. A
 division of the court of appeals concluded that a partial
 closure occurred but was justified under the four factors set
 forth in Waller. Rios, ¶¶ 25-32.
Specifically, the division determined that the record
 demonstrated an overriding interest that justified the
 closure-the protection of all trial participants from
 contracting or spreading COVID-19. Id. at ¶ 26.
In its view, the closure was no broader than necessary to
 protect that interest because the court provided live video
 and audio streaming of the trial to accommodate the public
 since social distancing requirements greatly reduced the
 number of people permitted in the courtroom. Id. at
 ¶ 27.

 ¶13
 The division also concluded that the trial court considered
 reasonable alternatives to closing the courtroom and agreed
 that a continuance was not a reasonable alternative due to
 the limited number of trials that could occur under the
 Resumption Plan. Id. at ¶¶ 28, 30. Last,
 the division acknowledged that the trial court did not cite
 Waller explicitly in its rulings but concluded
 nonetheless that its findings were sufficient and therefore
 that the closure was justified under Waller.
Id. at ¶ 31. And because the COVID-19 closure
 satisfied Waller, the division discerned no abuse of
 discretion in the court's ruling restricting access to
 the courtroom. Id. at ¶ 32.

 ¶14
 Rios petitioned this court for certiorari review, which we
 granted.[1]

 II.
Analysis

 ¶15
We begin by setting out the appropriate standard of review.
We then outline the relevant law pertaining to a
 defendant's constitutional right to a public trial. Next,
 we address the People's contention that the opportunity
 to virtually observe a jury trial can alone meet
 that right when there is no opportunity for the
 public to observe the proceedings in the physical courtroom.
We hold that it does not, and thus we conclude that a
 courtroom closure occurred.

 ¶16
We then proceed to apply the triviality standard set forth in
 People v. Lujan, 2020 CO 26, 461 P.3d 494, and
 conclude that the closure was nontrivial. Last, we conclude
 that the total courtroom closure, necessitated by public
 health restrictions related to the COVID-19 pandemic, was
 justified under Waller; therefore, the court did not
 violate Rios's right to a public trial. Accordingly, we
 affirm the judgment of the court of appeals.

 A.
Standard of Review

 ¶17
"A trial court's decision to close the courtroom
 presents a mixed question of law and fact." People
 v. Hassen, 2015 CO 49, ¶ 5, 351 P.3d 418, 420. This
 means that we "accept the trial court's findings of
 fact absent an abuse of discretion, but we review the
 court's legal conclusions de novo." Id.
(quoting Pena-Rodriguez v. People, 2015 CO 31,
 ¶ 8, 350 P.3d 287, 289, rev'd on other
 grounds, 580 U.S. 206 (2017)).

 B.
Sixth Amendment Right to a Public Trial

 ¶18
 Criminal defendants are guaranteed the right to a public
 trial under both the U.S. and Colorado Constitutions. U.S.
 Const. amends. VI, XIV; Colo. Const. art. II, § 16.
"This nation's accepted practice of guaranteeing a
 public trial to an accused has its roots in our English
 common law heritage." In re Oliver, 333 U.S.
 257, 266 (1948). After the ratification of the Sixth
 Amendment in 1791, which commands that "[i]n all
 criminal prosecutions, the accused shall enjoy the right to a
 speedy and public trial," every state eventually adopted
 similar constitutional provisions. See id. at 267.

 ¶19
 The right to a public trial serves multiple purposes. One
 purpose is to ensure the presence of interested spectators
 "for the benefit of the accused." Waller,
 467 U.S. at 46 (quoting Gannett Co. v. DePasquale,
 443 U.S. 368, 380 (1979)). The presence of such spectators
 serves, among other things, to keep an accused's

"triers keenly alive to a sense of their responsibility
 and to the importance of their functions." Id.
(quoting Gannett Co., 443 U.S. at 380). This, in
 turn, provides a safeguard against any attempt to employ our
 courts as instruments of persecution. In re Oliver,
 333 U.S. at 270.

 ¶20
 However, the Supreme Court has emphasized that the purpose of
 the right to a public trial extends beyond the accused.
"[I]n the broadest terms, public access to criminal
 trials permits the public to participate in and serve as a
 check upon the judicial process-an essential component in our
 structure of self-government." Globe Newspaper Co.
 v. Superior Ct., 457 U.S. 596, 606 (1982). For example,
 the right to a public trial maintains public faith and
 confidence in the justice system by allowing the public to
 see that the accused is fairly dealt with, ensuring that
 judges and prosecutors discharge their duties responsibly,
 encouraging witnesses to come forward, and discouraging
 perjury. Waller, 467 U.S. at 46. The right also
 "vindicate[s] the concerns of the victims and the
 community in knowing that offenders are being brought to
 account for their criminal conduct by jurors fairly and
 openly selected." Press-Enter. Co. v. Super.
 Ct., 464 U.S. 501, 509 (1984). It comes as no surprise,
 then, that the right to a public

 trial encompasses not only the trial itself but also other
 critical proceedings, including jury voir dire.[2] Stackhouse v.
 People, 2015 CO 48, ¶ 13, 386 P.3d 440, 444.
¶21 Unfortunately, holding jury trials became impossible
 beginning in March 2020 as the COVID-19 virus spread and
 public health restrictions were imposed across the state.
Notwithstanding this barrier, "defendants continue[d] to
 have a statutory right to speedy trial under section
 18-1-405(1)[, C.R.S. (2024)]," which "unfairly
 placed our trial courts in a catch-22." People v.
 Lucy, 2020 CO 68, ¶ 34, 467 P.3d 332, 339. The
 COVID-19 pandemic required courts to carefully and
 thoughtfully consider "how best to protect the many and
 varied users of our courts-litigants, attorneys, jurors,
 defendants, witnesses, victims . . . and many others- from
 the spread of COVID-19, while continuing to hear as many
 cases as possible in a manner that safeguards defendants'
 constitutional rights." Hernandez, ¶ 44,
 488 P.3d at 1065.

 ¶22
 That month, judicial districts across Colorado began
 utilizing Webex to hold court proceedings virtually. Webex is
 a video conferencing platform that allows spectators to see
 and hear what is happening in a physical courtroom virtually
 via a computer or phone. Depending on the placement of the
 camera or cameras

 providing the live feed, spectators may be able to see the
 entire courtroom or only a small part of it. In addition to
 allowing for virtual courtroom observation, Webex can also be
 configured with two-way video and audio to allow virtual
 courtroom participation. It is not ordinarily configured this
 way during jury trials given the very real risk of disruption
 and mistrials. This means that jurors cannot see when there
 are virtual spectators.[3] It is unclear from the record how Webex
 was configured during Rios's trial. District courts
 continued to use Webex's virtual courtroom observation
 and virtual courtroom participation features throughout the
 pandemic to maintain court operations. In fact, virtual court
 proceedings over Webex continue in many case types across the
 state today.

 ¶23
 The closure of a physical courtroom may violate a
 defendant's right to a public trial. People v.
 Jones, 2020 CO 45, ¶ 27, 464 P.3d 735, 741. But
 "the Sixth Amendment is not necessarily violated
 'every time the public is excluded from the
 courtroom.'" Lujan, ¶ 16, 461 P.3d at
 498 (quoting Peterson v. Williams, 85 F.3d 39, 40
(2d Cir. 1996)). "[S]ome closures are simply so trivial
 that they do not rise to the level of a constitutional
 violation." Id. In determining whether a
 closure was

 trivial, "courts look to the totality of the
 circumstances surrounding the closure." Id. at
 ¶ 19, 461 P.3d at 498.

 ¶24
 Even if a reviewing court determines that a closure was
 nontrivial, it does not necessarily follow that a party's
 right to a public trial was violated because the right is not
 absolute and, at times, must yield to competing interests.
Waller, 467 U.S. at 45. In Waller, the
 Supreme Court set forth a four-part test for trial courts to
 apply to determine whether a courtroom closure complies with
 the Sixth Amendment. Id. at 48. The test requires
 that (1) "the party seeking to close the [proceeding]
 must advance an overriding interest that is likely to be
 prejudiced," (2) "the closure must be no broader
 than necessary to protect that interest," (3) "the
 trial court must consider reasonable alternatives to closing
 the proceeding," and (4) "[the trial court] must
 make findings adequate to support the closure."
Id. A nontrivial closure that does not meet this
 test is an unconstitutional deprivation of a defendant's
 right to a public trial that constitutes structural error.
Id.

 C.
Whether a Closure Occurred1. Closure Generally

 ¶25
This case requires us to consider whether the opportunity for
 free, contemporaneous virtual access to observe court
 proceedings can alone-when there is no opportunity to observe
 the proceedings in the physical courtroom-satisfy a
 defendant's right to a public trial. Does the right
 require the

 court, as Rios argues, to provide the public with unfettered
 access to physical seats in the courtroom or an alternative
 venue? Or does it, as the prosecution contends, simply
 require the free and contemporaneous virtual opportunity to
 observe those proceedings subject to the public trial right?
Rios maintains that access to the physical courtroom is key
 because virtual observation lacks the same impact as
 in-person observation and cannot meet the purposes of the
 right. By contrast, the People claim that the physical
 courtroom need not be open to the public at all if this type
 of virtual access to the courtroom is available. The Sixth
 Amendment does not require, they add, that jurors be able to
 see spectators at all. This is because an accused's right
 to a public trial, in their view, is rooted in the
 Framers' concerns regarding secret trials, and the
 technology used here safeguards against those concerns.

 ¶26
We are mindful as we consider this issue that virtual
 courtroom technology can be a great convenience to litigants,
 lawyers, the court, and the public. It can also advance the
 important goal of increasing access to justice. We recognize
 as well that this technology can present challenges-from
 bandwidth issues that undermine reliable connectivity, to
 individuals attempting to disrupt virtual court proceedings.
But the legal question we face is not whether the use of this
 technology is a good idea, but rather what the Sixth
 Amendment right to a public trial encompasses.

 ¶27
 To answer this question, we look to the purposes that the
 right serves. As we explained, the Supreme Court's
 decision in Waller illustrates that there are many
 purposes. Preventing secret trials is, indeed, one of these
 purposes. The right to a public trial allows the public to
 see that the defendant "is fairly dealt with and not
 unjustly condemned." Waller, 467 U.S. at 46
(quoting Gannett Co., 443 U.S. at 380). But that is
 not the only purpose. Additionally, as we explained above,
 "the presence of interested spectators"
 keeps the jury "keenly alive" to the importance of
 its function and to a sense of its responsibility and ensures
 that judges and prosecutors carry out their duties
 responsibly, encourages witnesses to come forward, and
 discourages perjury. Id. (emphasis added) (quoting
Gannett Co., 443 U.S. at 380).

 ¶28
We conclude, in light of these purposes, that the Sixth
 Amendment right to a public trial is best understood
 as a trial that is open to the public, meaning that the
 public has a reasonable opportunity to be physically
 present to observe the proceedings. We reach this
 conclusion for three reasons.

 ¶29
 First, this understanding hews most closely to the purposes
 of the right to a public trial. The connection is
 particularly striking as it pertains to the public's role
 in keeping the jury "keenly alive to a sense of their
 responsibility" and to the importance of their function
 by virtue of the public's presence. Id.
(quoting Gannett Co., 443 U.S. at 380). Screens in a
 courtroom, no matter their number or the nature

 of their display, are an inadequate substitute for the
 physical presence of real spectators in the gallery and the
 powerful reminder that those spectators provide to jurors
 regarding the gravity of their role. Plus, this virtual
 technology is not ordinarily configured to allow jurors to
 see spectators due to the risk of disruption and potential
 mistrial.

 ¶30
 Second, this reading comports with the ordinary understanding
 of the term "public," which is defined as
 "exposed to general view: open." Public,
 Merriam-Webster Dictionary,
 https://www.merriam-webster.com/dictionary/ public
 [https://perma.cc/9KAV-94U6]. The term "presence"
 is defined as "the fact or condition of being
 present." Presence, Merriam-Webster Dictionary,
 https://www.merriam-webster.com/dictionary/presence
 [https://perma.cc/ 3KKL-LJ59]. The term "present"
 is defined as "constituting the one actually involved,
 at hand, or being considered." Present,
 Merriam-Webster Dictionary,
 https://www.merriam-webster.com/dictionary/present
 [https://perma.cc/7VRZ-JQ9H]. Read in tandem, these
 definitions support the understanding that a public trial
 involves the opportunity for spectators to be
 physically present to observe the proceedings.

 ¶31
 Third, and finally, the Framers saw great value in the
 benefits associated with a public trial. Waller, 467
 U.S. at 49 n.9. The Framers, of course, could not have
 imagined a public trial that involved spectators who were not
 somehow

 physically present. See Richmond Newspapers, Inc. v.
 Virginia, 448 U.S. 555, 577 (1980); see also United
 States v. Haymond, 588 U.S. 634, 642 (2019) ("[T]he
 Constitution's guarantees cannot mean less today than
 they did the day they were adopted."). And the Framers
 could not have imagined the bandwidth and connectivity issues
 that district courts around the state face from time to time.
More importantly, changes in technology do not lessen
 constitutional protections.

 ¶32
 That is all to say that it is difficult to square the
 People's vision of the right as nothing more than the
 opportunity for the public to watch something akin to live
 television (over a platform that usually, but does not
 always, work) with the value that the Framers placed on the
 physical presence of spectators to ensure that a defendant
 receives a fair trial. As a division of the courts of appeals
 noted in People v. Roper, 2024 COA 9, ¶ 15, 547
 P.3d 1154, 1159, if the public trial right can be satisfied
 by virtual public access alone, "all future trials could
 be conducted in this fashion for any reason-or, indeed, for
 no reason whatsoever." We do not believe that this is
 what the Framers intended. Thus, we reject the People's
 argument that the Sixth Amendment requires nothing more than
 the free and contemporaneous opportunity to virtually observe
 proceedings subject to the public trial right.

 ¶33
We also, however, reject Rios's contention that the Sixth
 Amendment requires courts to provide the public with physical
 seats in the courtroom or an

 alternative venue in all proceedings. This is because the
 right to a public trial is not without limits. It requires a
 reasonable opportunity to be physically present to
 observe those court proceedings that fall within the public
 trial right. Waller, 467 U.S. at 48. Thus, a total
 closure occurs when state action prevents the public from
 having any reasonable opportunity to observe proceedings
 contemporaneously in the physical courtroom. And a partial
 closure occurs when the state action excludes one or more
 individuals from the reasonable opportunity to observe the
 physical courtroom. E.g., People v. Turner, 2022 CO
 50, ¶ 26, 519 P.3d 353, 360 (holding that the exclusion
 of a disruptive spectator was a nontrivial, partial closure).

 ¶34
 Judges have no obligation to provide unlimited seating
 because they have no ability to do so. Courtrooms come in all
 shapes and sizes, and they all have physical capacity
 limitations as well as limitations imposed by local fire
 codes. Just because, for instance, one hundred people want to
 personally observe a high-profile criminal case, it does not
 follow that some of them are excluded by the court if there
 is only room for sixty spectators in the gallery due to the
 size and configuration of the courtroom or the requirements
 of the local fire code. It also does not mean that the
 courtroom is closed to the forty spectators who will not be
 able to sit in the gallery; it means only that the
 courtroom's seating capacity is limited to sixty people.
These are not courtroom closures.

 ¶35
 The same reasoning applies to the CDC public health
 restrictions that limited courtroom seating capacity during
 the pandemic. Social distancing requirements meant that
 courtrooms often had very limited seating. In our view, these
 limitations are no different than other types of courtroom
 capacity constraints. That is, the inability of some
 members of the public to be physically present in a courtroom
 to observe the proceedings due to public health restrictions,
 like social distancing, is not a closure. Rather, it is a
 limitation on courtroom capacity. So even if seventy people
 wanted to observe a criminal jury trial during the height of
 the pandemic, and public health restrictions limited a
 courtroom's capacity to twelve, that was not a courtroom
 closure. Relatedly, the fifty-eight members of the public who
 could not access a physical seat in the gallery were not
 excluded by state action from the courtroom.

 ¶36
 But what about hybrid proceedings? That is, what about those
 situations in which a courtroom is not closed and the court
 also provides virtual access via Webex or a similar platform.
In our view, the virtual platform in that circumstance is not
 a substitute for public access, rather it affords the public
 an additional means of access. And, importantly,
 while that additional access promotes transparency, it is not
 constitutionally required. That means that if a spectator
 observing virtually loses connectivity or is kicked off the
 platform by the court or court staff

 for engaging in disruptive behavior during a critical
 proceeding in a criminal case, no defendant's Sixth
 Amendment right to a public trial is violated.

 2.
This Trial

 ¶37
 When a court entirely closes a courtroom so
 no member of the public has the opportunity to
 observe proceedings in the physical courtroom, the court has
 engaged in state action that constitutes a closure. See
 Turner, ¶ 18, 519 P.3d at 359. And, because the
 public trial right requires that spectators have the
 opportunity to view the proceedings in the physical
 courtroom, free contemporaneous virtual public access to the
 proceedings does not replace public access to the physical
 courtroom.

 ¶38
 Thus, the court's decision here to close the physical
 courtroom throughout the trial to everyone but the trial
 participants constituted a total closure. Our analysis,
 however, does not stop there. To implicate a defendant's
 right to a public trial, the courtroom closure must be
 nontrivial. Lujan, ¶ 19, 461 P.3d at 498.

 ¶39
 To determine whether a closure is trivial, we "consider
 whether it implicate[s] the protections and values of the
 public trial right." Id. at ¶ 28, 461 P.3d
 at 500. Factors to consider include (1) the duration of the
 closure, (2) the substance of the proceedings that occurred
 during the closure, (3) whether the proceedings were later
 memorialized in open court or placed on the record, (4)
 whether the closure was intentional, and (5) whether the
 closure was total or

 partial. Id. at ¶ 19, 461 P.3d at 498-99. This
 list of factors is nonexhaustive, and no single factor is
 dispositive. Id., 461 P.3d at 499.

 ¶40
 In our view, the closure here was nontrivial. Although the
 public was able to view the entirety of the proceedings
 remotely, the closure of the physical courtroom was
 intentional, and it lasted the entire duration of the trial.
True, the closure was necessary given the many public health
 restrictions imposed during this time due to the COVID-19
 pandemic and the trial court's stated concerns about the
 spread of the virus. These circumstances weigh heavily in our
 consideration of whether the closure was warranted under
 Waller. But at this stage of the analysis, the
 question before us is whether the closure was intentional,
 not whether it was necessary. See Jones, ¶ 40,
 464 P.3d at 744 ("[I]ntentional closures during more
 significant, and less fleeting, testimony are generally
 considered not trivial because of their potential to affect
 the fairness of the proceedings."). Therefore, we
 conclude this was a nontrivial closure.

 D.
Whether the Closure was Constitutional

 ¶41
We next apply the four Waller factors to determine
 whether this nontrivial closure violated Rios's
 constitutional right to a public trial.

 ¶42
 The first Waller factor is whether an overriding
 interest justified the closure. 467 U.S. at 48.[4] Here, there is no
 real question that the public health restrictions regarding
 COVID-19 justified the closure. The record reflects that the
 court was concerned about the health of the jurors and the
 other trial participants. It outlined specific precautions to
 ensure their physical safety, including limiting the number
 of people in the courtroom in accordance with CDC guidelines.
And it found that these restrictions were "due to the
 health emergency and the fact that the jury will be sitting
 in all of the benches, maintaining [six]-foot spacing
 pursuant to health directives and the chief judge's
 order."

 ¶43
We see no support for Rios's assertion that the
 court's decision to close the courtroom was motivated by
 a desire to get the case tried quickly rather than by public
 health guidelines and concern over the spread of COVID-19.
The court repeatedly addressed its concern about the risk to
 the trial participants' health due to COVID-19. These are
 concerns Rios himself raised in his motion to continue. The
 court's focus was on complying with public health
 guidelines; the restrictions outlined in Order 20-110 and the
 Resumption Plan; and reducing the spread of

COVID-19. Alone or together, these overriding interests
 unquestionably meet the first Waller factor. See
 Turner, ¶ 41 n.4, 519 P.3d at 363 n.4 (stating that
 an exclusion of the public to ensure "the safety of
 trial participants" satisfied the first Waller
 factor).

 ¶44
 The second Waller factor-whether the closure was no
 broader than necessary-was also satisfied. 467 U.S. at 48.
The closure occurred in the midst of a global pandemic.
Although the closure physically excluded the public entirely,
 the closure was not overbroad because the physical space in
 the courtroom was necessarily limited by the CDC's social
 distancing requirements and other public health restrictions
 imposed due to the public health crisis. We consequently
 conclude that the scope of the closure was no broader than
 necessary to comply with the public health restrictions and
 to protect trial participants from contracting or spreading
 COVID-19. Therefore, the second Waller factor was
 satisfied.

 ¶45
 The third Waller factor is whether the court
 considered reasonable alternatives. Id. The record
 shows that the court considered the use of reasonable
 alternatives, here the use of Webex and video and audio
 streaming in the auxiliary courtroom, and that there simply
 weren't-in the midst of a global pandemic-any other
 reasonable alternatives. We are unmoved by Rios's claims
 to the contrary. The alternative venues that Rios mentions
 now, like convention centers, arenas, and performing arts
 venues, were not raised as alternatives before

the trial court. But in any event, these were not reasonable
 alternatives as the record contains no indication that these
 types of venues were available or that, even if they were,
 the Twentieth Judicial District had the financial resources
 to pay for them. What's more, there is no evidence in the
 record indicating that a criminal jury trial could be safely
 held in an arena or a convention center or that the Boulder
 County Sheriff's Department could provide the resources
 needed to securely conduct a criminal jury trial in one of
 these types of venues.

 ¶46
 Rios argues that a continuance would have been another
 reasonable alternative. We disagree. Recall that trials were
 suspended from mid-March to October 2020 due to the COVD-19
 pandemic, leading to a six-month backlog of cases waiting to
 be tried. Significantly, only one felony jury trial could be
 held in the Twentieth Judicial District at a time under Order
 20-110 and the Resumption Plan due to the CDC's public
 health restrictions. This meant that a continuance would have
 led to months of further delay, not only in Rios's trial,
 but in all the other backlogged cases waiting to go to trial.
All this delay, of course, would then be compounded even
 further by the delays that accompany the scheduling of any
 two-and-a-half-week jury trial due to attorney and witness
 schedules.

 ¶47
 Plus, recall that Rios went to trial in October 2020, well
 before the development of a COVID-19 vaccine. Outbreaks of
 the virus plagued not only Boulder County, but almost every
 county in the state. There was tremendous

 uncertainty at that time about how, precisely, COVID-19 was
 spread, when a vaccine would be developed, how long the
 pandemic would last, and when the public health restrictions
 would end. All signs suggested that the scheduling of jury
 trials would likely continue to be limited for quite some
 time and that jury trials might even be halted again.

 ¶48
 Additionally, a continuance could have prejudiced the
 prosecution's case because some of its witnesses were
 elderly, and one of its witnesses had been diagnosed with
 dementia. Based on these circumstances, we conclude that the
 third factor was satisfied.

 ¶49
 Last, we turn to the fourth Waller factor-whether
 the court made findings adequate to support the closure.
Id. We conclude that the trial court did so.

 ¶50
We begin our analysis by observing that most cases involving
 a defendant's right to public access involve courtroom
 closures ordered in response to an unexpected event rather
 than a known condition. See Turner, ¶¶
 1-3, 519 P.3d at 356. Cases involving courtroom closures
 based on public health restrictions imposed due to COVID-19
 are markedly different. The CDC's social distancing and
 other public health restrictions shuttered courtrooms to jury
 trials for months on end. Chief judges and affected
 stakeholders spent countless hours deciding how to safely
 re-open physical courtrooms, in light of those
 restrictions, so that districts could resume jury trials. The
 reality is that these efforts, as here, at times

 necessarily required the total closure of courtrooms simply
 to keep trial participants safe.

 ¶51
We note that the trial court did not cite Waller by
 name in its various orders and comments regarding the closure
 but conclude for several reasons that it made sufficient
 findings to support the closure. First, it is clear from the
 record that short of violating the pertinent public health
 restrictions, the trial court had no choice but to close the
 courtroom to the public so Rios's trial could safely
 proceed. Second, the record reflects that the court was
 engaged in planning how to safely re-open the courtroom to
 conduct Rios's trial, which, as noted, necessarily
 involved closing the courtroom to the public. This was not a
 spur of the moment closure order, but rather one that was
 planned well in advance, based on the public health guidance
 that animated Order 20-110 and the Resumption Plan, and
 designed to protect trial participants from contracting or
 spreading COVID-19. Thus, we look not only to the court's
 ruling on Rios's objection to the closure at the outset
 of the trial, but at the broader record, including the
 court's findings and comments about the need for the
 closure in advance of the trial. And here, the court
 explicitly found in several orders before trial that the
 restrictions to the proceedings were "based upon
 procedures required by the health emergency." Third, on
 the first day of trial, the court stated that public access
 to the physical courtroom was "restricted due to the
 health emergency and the fact that the jury

 will be sitting in all of the benches" to maintain the
 social distancing guidelines set forth in the Resumption
 Plan. The court explained, "public access to the
 courtroom will be via Web[e]x and will have a projection of
 the Web[e]x" in an auxiliary courtroom.

 ¶52
 The bottom line is that the court's decision to close the
 courtroom to all spectators was animated by its concern with
 preventing the spread of COVID-19 among trial participants.
Any one of the multiple findings and comments by the court
 leading up to the trial regarding the need for the closure
 would be sufficient to support its decision. As we have
 observed, we gauge "compliance by substance, not
 form." Turner, ¶ 35, 519 P.3d at 362.
Here, the substance of the court's various findings and
 comments leading up to the trial leaves no doubt that the
 fourth Waller factor was satisfied.

 ¶53
 Because the court's COVID-19 closure satisfies the
 Waller requirements, we conclude that Rios's
 right to a public trial was not violated.

 III.
Conclusion

 ¶54
 Virtual access alone is not a substitute for giving the
 public the opportunity to observe proceedings in the physical
 courtroom for purposes of the Sixth Amendment. Here, even
 though virtual access was provided, the trial court's
 order totally excluding the public from the physical
 courtroom nonetheless constituted a nontrivial closure. No
 new trial is warranted, however, as the record

 justifies the closure order under Waller. We
 therefore affirm the judgment of the court of appeals.

 JUSTICE HART, joined by JUSTICE BOATRIGHT, and JUSTICE
 SAMOUR, concurring in the judgment.

 ¶55
 The majority today holds that "virtual access alone is
 not a substitute for the public's reasonable opportunity
 to personally observe critical proceedings in a physical
 courtroom." Maj. op. ¶ 3. I cannot agree. The right
 guaranteed by both the U.S. and Colorado Constitutions, U.S.
 Const. amends. VI, XIV; Colo. Const. art. II, § 16, is a
 public trial right. It is not a public
 courtroom right.

 ¶56
 In the circumstances presented here-where the court provided
 an auxiliary space with video- and audio-streaming of the
 proceedings and the proceedings were made available for
 public viewing over Webex-I do not believe that Isaiah Ismael
 Rios's public trial right was violated because I do not
 believe there was a closure of the proceedings. I therefore
 respectfully concur in the judgment only.

 ¶57
 As the U.S. Supreme Court has explained, "The purpose of
 the requirement of a public trial was to guarantee that the
 accused would be fairly dealt with and not unjustly
 condemned. History had proven that secret tribunals were
 effective instruments of oppression." Estes v.
 Texas, 381 U.S. 532, 538-39 (1965); see also In re
 Oliver, 333 U.S. 257, 270 (1948) (explaining that the
 Sixth Amendment is designed to "safeguard against any
 attempt to employ our courts as instruments of
 persecution"). Public trials also increase public
 confidence in the justice system and ensure that victims and
 the broader community know that offenders are being

 held responsible. Press-Enter. Co. v. Super. Ct.,
464 U.S. 501, 508-09 (1984); see also Smith v. Doe,
 538 U.S. 84, 99 (2003) ("Transparency is essential to
 maintaining public respect for the criminal justice system,
 ensuring its integrity, and protecting the rights of the
 accused.").

 ¶58
 The majority notes (and I agree) that the public trial right
 also serves to keep the participants in the process-the
 jurors, the witnesses, the judge, and the lawyers-aware of
 the importance of their functions. See Maj. op.
 ¶ 27. Justice Harlan, concurring in Estes, noted that
 “the [public trial] guarantee embodies a view of human
 nature, true as a general rule, that judges, lawyers,
 witnesses, and jurors will perform their respective functions
 more responsibly in an open court than in secret
 proceedings.” 381 U.S. at 588 (Harlan, J., concurring).

 ¶59
 Where the majority and I part company is in the leap from a
 recognition of those purposes to the conclusion that a public
 trial requires a proceeding in which members of the public
 have what the majority describes as "a reasonable
 opportunity" to be physically present in the courtroom.
Maj. op. ¶¶ 28, 33.

 ¶60
 I would conclude that a trial has not been closed where, as
 was the case here, (1) critical proceedings are open to
 contemporaneous public scrutiny (in-person or virtual), and
 (2) the participants in the process (jurors, lawyers,
 witnesses, and judges) are aware that those critical
 proceedings are subject to contemporaneous

 public scrutiny. If those two criteria are met, the purposes
 of the Sixth Amendment public trial guarantee are served.

 ¶61
 By offering a route for contemporaneous, in-person
 observation by the public, even virtual proceedings serve the
 goals of system accountability, increased confidence in the
 justice system, and provision of a means for victims and
 members of the public to see that the offender is being held
 responsible. And by making it clear to the participants in
 the process that the public has access to that route for
 observation, the judge can ensure that those participants are
 "keenly alive to a sense of their responsibility and to
 the importance of their functions." Waller v.
 Georgia, 467 U.S. 39, 46 (1984).

 ¶62
 The majority relies heavily on Waller's
 reference to the public's "presence" as being
 the thing that keeps the participants "keenly
 alive" to their duties. Maj. op. ¶ 27. In fact, the
 majority seems to suggest that Waller actually
 stands for the proposition that one of the purposes of the
 public trial right is "to ensure the presence of
 interested spectators." Maj. op. ¶ 19.
Waller says no such thing. And I don't think one
 can put meaningful weight on the single word
 "presence" in the text the majority is quoting from
 Waller, 467 U.S. at 46, which is from a 1948
 opinion, Oliver, 333 U.S. at 270 n.25, that in turn
 quotes from a 1927 legal treatise. There were no options
 other than physical presence to observe the critical
 proceedings of a trial during those times.

 ¶63
 Similarly, the majority turns to an argument that the
 ordinary understanding of the term "public" is best
 understood as requiring physical presence. The majority
 supports this claim by noting that one definition of
 "public" is "exposed to general view:
 open." Maj. op. ¶ 30 (quoting Public,
 Merriam-Webster Dictionary,
 https://www.merriam-webster.com/dictionary/ public
 [https://perma.cc/9KAV-94U6]). The opinion then suggests some
 connection to presence. Id. But synonyms for
 "public" include "open,"
"publicized," "shared,"
"broadcast," "available," and
 "unrestricted." Id. I am not convinced
 these dictionary battles help answer the question we face
 here. If anything, I think they suggest that a proceeding is
 public if it is available to as many people as are interested
 in observing it. Virtual proceedings-and particularly
 livestreaming-have made trials as available, and as
 unrestricted, as one can currently imagine. The actions of
 lawyers and judges and the testimony of witnesses have never
 faced the kind of public scrutiny they face in today's
 trial proceedings.

 ¶64
 I acknowledge that public access to a physical courtroom has
 benefits that virtual access does not.[1] While technology
 continues to improve, and today's

 technology is better than that of a decade ago, it has
 limitations that in-person viewing does not. On the other
 hand, as the majority acknowledges, the reality of the many
 sizes and shapes of courtrooms-and the difference in public
 interest from one trial to the next-means that there will be
 many trials in which public access to a physical courtroom is
 limited. Id. at ¶ 34; see also Estes,
 381 U.S. at 588 (Harlan, J., concurring) ("Obviously,
 the [public trial] guarantee is not violated if an individual
 member of the public cannot gain admittance to a courtroom
 because there are no available seats."). Courts,
 including the majority here, have generally accepted that not
 every member of the public who wants to observe a trial in
 person will necessarily be able to do so.

 ¶65
 The majority addresses this concern in two ways. First, it
 says that virtual access can be a supplement to, but never a
 replacement for, some physical access. Maj. op.
 ¶ 36. Second, it says that the fact that not everyone
 will be able to watch because of space or other limitations
 is a capacity problem and not a closure problem.
Id. at ¶¶ 34-35.

 ¶66
 I struggle to see the constitutional principle supporting
 either of these distinctions. As to the first, I've
 already addressed why I don't believe that the public
 trial right requires physical presence for protection; what
 it requires is contemporaneous public scrutiny and the
 awareness of the participants in the proceeding that the
 public is-or could at any time be-watching. As to the

 second, I have heard no explanation for where the lines are
 appropriately drawn. It seems from the companion case,
 People v. Bialas, 2025 CO 45, ___ P.3d ___, to this
 one that opening the physical courtroom to only six members
 of the public would be sufficient to satisfy the Sixth
 Amendment. Would opening it to five members of the public be
 sufficient? Or two? Or one?

 ¶67
 Moreover, I worry that, by making the absolute statement that
 virtual access is not enough-that "the public trial
 right requires that spectators have the opportunity to view
 the proceedings in the physical courtroom," Maj. op.
 ¶ 37-we are hobbling ourselves for a future in which a
 growing number of critical proceedings take place
 virtually-even in the absence of a global
 pandemic.[2] I cannot predict what the future will
 bring in how we use technology-and neither can the majority.
Prior to 2020, the idea that criminal trials would be
 livestreamed for free public viewing was hard to imagine.
Today, it is legally required. See §
 13-1-132(3.5)(a), C.R.S. (2024).

 ¶68
 I believe that a trial is not closed when critical
 proceedings are subject to virtual, contemporaneous public
 scrutiny and the participants in the process are aware that
 those critical proceedings are subject to contemporaneous
 public scrutiny. For this reason, I do not believe that Rios
 was denied his Sixth Amendment right to a public trial. I
 therefore respectfully concur in the judgment only.

---------

[1] We granted certiorari to review the
 following issue:

Whether the trial court violated Mr. Rios's right
 to a public trial by excluding all spectators from the
 physical courtroom during the COVID-19 pandemic, where
 proceedings remained accessible to the public on Webex and
 via video streaming in an overflow courtroom.

[2] This opinion is limited to those
 critical proceedings that are subject to the right to a
 public trial. For ease of reading, we refer to these simply
 as "critical proceedings."

[3] Livestreaming is a term used to
 describe the real-time broadcasting of video and audio
 content over the internet. Livestreaming allows a spectator
 to remotely watch a court proceeding in real time, but the
 video and audio are not two-way. That is, the people in the
 courtroom, including the jurors and the judge, cannot see
 that they are being watched.

[4] Many jurisdictions have considered
 whether the "overriding interest" standard is
 necessary in partial closure cases or whether a lesser
 standard-"substantial reason" -is more appropriate.
See Jones, ¶¶ 24-26, 464 P.3d at 741
(collecting cases and explaining the competing views on this
 issue). This is an issue we need not resolve today.

[1] And further, within the world of
 virtual access, it would be best if the participants in the
 courtroom could see any spectators in an overflow or
 ancillary viewing space to increase their awareness of those
 spectators' presence.

[2] I worry generally about the absolute
 statements that we make in this area of the law. For example,
 when we say there must be physical access to
 critical proceedings to satisfy the public trial right, it
 strikes me that there may be procedures our courts are
 currently following that we will need to change. For example,
 do courts need to reserve some seats for the public in jury
 assembly rooms as prospective jurors fill out questionnaires
 and watch the jury orientation video? That is part of voir
 dire, which is a critical proceeding. Stackhouse v.
 People, 2015 CO 48, ¶ 13, 386 P.3d 440, 444;
see also Maj. op. ¶ 20.

---------